IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LAURA L. HARVEY,**                                    Case 5:14 CV 2466

      Plaintiff,

      v.                                                   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                      MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Laura Harvey ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 13). For the reasons stated below, the undersigned affirms the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on May 11, 2011, alleging an onset date of January 1, 2011. (Tr. 216-29). Plaintiff applied for benefits due to pain in her left shoulder and both knees, learning problems, and asthma. (Tr. 98). Her claims were denied initially and upon reconsideration. (Tr. 98-129, 132-63). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 192). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on June 10, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 25-45, 52-95). The Appeals Council denied Plaintiff's request for review, making the hearing decision the

final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on November 7, 2014. (Doc. 1).

FACTUAL BACKGROUND

*Personal Background and Testimony*

Born January 4, 1967, Plaintiff was 46 years old as of the hearing date. (Tr. 59). She had completed the eleventh grade and was a "B" average student. (Tr. 59, 348). She lived in a house with her two adult sons and a minor niece, of whom she had temporary custody. (Tr. 60). She had past work as a psychic reader, but she was no longer able to perform because the medicine blocked her readings. (Tr. 75-76).

Plaintiff took pain medication every day and it was 75% effective at reducing her pain. (Tr. 65-66). But she complained of side effects, mainly that the medication made her sleepy and sometimes nauseous. (Tr. 63).  She testified her knee replacements were not holding up well and that she could not bend or kneel due to constant pain. (Tr. 64-65). Plaintiff also testified she could not leave the house without her cane and could not stand or walk for more than fifteen minutes without needing a break. (Tr. 66-67). She also complained that sitting caused back pain which was only relieved by elevating her legs in a recliner. (Tr. 67). Plaintiff stated she only slept about four hours intermittently during the night due to pain but she took naps every day for several hours. (Tr. 67-68, 82-83). She testified to a complete inability to use her left arm and hand due to her shoulder injury. (Tr. 69, 268). Plaintiff went to counseling once a month at Portage Path Behavioral Center for treatment of Obsessive Compulsive Disorder ("OCD") which caused her to redo projects over and over until they were perfect, most recently involving her bedroom and closet. (Tr. 71-73).

As to activities of daily living, she testified she drove alone two to three times a week to either the doctor or for short shopping trips. (Tr. 73-74). Plaintiff stated she performed some

2

chores such as making her bed, picking up around the house, and loading the dishwasher. (Tr. 278). She did cook a little; mostly, she would prep the meals and the children would finish them because she could not stand for the whole time. (Tr. 74, 278). Plaintiff stated her day began about noon when she would get dressed, then watch TV, and get on the computer. (Tr. 74-75). She was capable of completing most of her personal care unassisted, although she sometimes needed help getting dressed and showering. (Tr. 277). She testified her neighbor was a frequent visitor to the home and they often socialized. (Tr. 77-79, 280). Plaintiff stated she was capable of paying bills, counting change, and handling a savings account. (Tr. 279).

*Affidavit of Jonathan Harvey*

Plaintiff's son, Jonathon Harvey, stated Plaintiff's medical problems had grown progressively worse, including frequent dislocations of her left shoulder, difficulty utilizing her left arm, neck pain, and knee pain**.** (Tr. 325-26). These medical problems made it hard for Plaintiff to complete household chores, and Mr. Harvey stated he performed most of them. (Tr. 326). He stated Plaintiff would begin the chores but then he or others in the family would have to complete them. (Tr. 326). Mr. Harvey stated that although his mother tells people she does repairs in the home; it is actually him who does them. (Tr. 326). He also reported mood swings, depression, agitation, and obsessive behavior. (Tr. 327).

**Relevant Medical Evidence[1]**

*Physical*

Plaintiff began treating at Summit Pain Specialists in June 2010 following shoulder surgery and continued treatment every one to two months until the alleged onset date. (Tr. 542-

---

1. Medical evidence from before the alleged onset date is not summarized herein. A claim for benefits must be established during the relevant time frame, *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004); thus, any discussions of evidence that pre-dates the alleged onset date are for historical purposes and not for the purpose of establishing entitlement to disability.

56). On January 24, 2011, Plaintiff described her left shoulder and bilateral knee pain as throbbing, sharp, and stabbing, and rated it a seven out of ten. (Tr. 557).  Dr. Guang Yang observed she had significantly decreased range of motion and guarding in her left shoulder. (Tr. 558). A couple of months later, Plaintiff reported the same pain level but stated the treatment plan was allowing her to perform all activities of daily living; significantly, her range of motion in the left shoulder had improved greatly. (Tr. 560-61). Dr. Yang's observations over the next few months revealed stable pain management but consistent reports of decreased functional abilities in both Plaintiff's shoulder and knees. (Tr. 566-67, 569-71). In July 2011, Dr. James Bressi recommended Plaintiff see Dr. Douglas Chonko for bilateral knee evaluations. (Tr. 572).

On examination by Dr. Chonko, Plaintiff's knees were tender, with bilateral crepitus, and decreased range of motion bilaterally. (Tr. 577). X-rays and MRIs revealed moderate to severe degenerative joint disease ("DJD") in both knees. (Tr. 578). Dr. Chonko recommended a left total knee arthroplasty. (Tr. 578). The surgery was completed without complications in mid-August 2011. (Tr. 579-92).

At follow-ups with Dr. Yang after the surgery, she continued to complain of bilateral knee pain, although she remained able to perform her activities of daily living. (Tr. 639, 641, 643). On examination in December 2011, Plaintiff's shoulder showed 5/5 strength and was negative for swelling and atrophy, but had an abnormal range of motion. (Tr. 637). At the same time, her right knee was positive for swelling and tenderness, but her left knee showed no swelling. (Tr. 637). In January 2012, Plaintiff returned, complaining of pain in both knees and her left shoulder. (Tr. 634). She wished to revise her treatment course despite the fact that it was moderately successful at controlling her pain. (Tr. 635).

Plaintiff continued to receive monthly treatment from Dr. Yang for pain management in the later months of 2012, where she consistently reported stable pain management. (Tr. 738-52). In

December 2012, her main complaint was cervical spine and neck pain. (Tr. 738). She reported her current pain medication was working appropriately to control her pain and described her cervical pain as the "most bothersome." (Tr. 739). Throughout 2013, Plaintiff had consistent complaints of neck, back, knee, and shoulder pain. (Tr. 718-30). Although she stated she could perform her activities of daily living, Plaintiff reported drowsiness as a side effect of her medication dosage. (Tr. 715).

In May 2013, Dr. Chonko assessed Plaintiff with osteoarthritis and requested a bone scan. (Tr. 774). He noted the left knee had tenderness on palpitation but full range of motion, and showed no loosening of the prosthesis. (Tr. 775). The bone scan revealed positive findings possibly related to prosthetic loosening or infection. (Tr. 779). Plaintiff continued to complain of bilateral knee pain in July 2013 and Dr. Chonko recommended total knee revisions. (Tr. 781-82).

*Mental*

In January 2012, Plaintiff saw a counselor at Portage Path Behavioral Health; she complained of panic attacks, possible depression, mood swings, anger, attention deficit hyperactivity disorder ("ADHD"), and OCD. (Tr. 674-85). On mental status examination she was described as friendly, with full affect, relaxed, good eye contact, no hallucinations or paranoia, racing thought process, average intelligence, and fair judgment. (Tr. 684). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 56.[2] (Tr. 686). A month later, Plaintiff was seen by Sameera Khan, M.D., at Portage Path; she reported Plaintiff had ADHD but could

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

"concentrate on 2-3 tasks at the same time", had symptoms of OCD, and denied any depression. (Tr. 688).

From May to October 2012, Plaintiff's mental status exam showed appropriate affect, cooperative behavior, anxiety, fair insight and judgment, and a fluctuation between logical and tangential, racing thoughts. (Tr. 762, 763, 766, 768, 770, 772).

On December 20, 2012, a medical source statement was completed by Charles Goold, LISW, and co-signed by Dr. Khan. (Tr. 693-95). It was opined Plaintiff had marked loss or extreme loss in all of the subcategories of understanding, carrying out, and remembering simple instructions and marked loss in her ability to accept instruction and get along with co-workers. (Tr. 693). Further, she had moderate loss at the ability to make simple work-related decisions, ask simple questions, and to respond appropriately to changes in the workplace. (Tr. 694). It also noted a medically documented history of mental, schizophrenic, or affective disorders that had resulted in at least three episodes of decompensation. (Tr. 694).

At a medication management session on December 26, 2012, Dr. Khan observed clear speech, adequate grooming, no delusions or hallucinations, full affect, cooperative behavior, fair insight and judgment, and logical thought process. (Tr. 757). But by February 27, 2013, Mr. Goold reported Plaintiff to have rapid speech, agitated activity, impaired ability to abstract, depression, anger, poor judgment and insight, and tangential thoughts. (Tr. 755). Mr. Goold reported a similar mental status examination in May 2013. (Tr. 753).

### Consultative Examiners

*Gary Sipps, Ph.D.*

On September 3, 2011, Plaintiff underwent a psychological consultative examination with Dr. Sipps. (Tr. 599). Plaintiff reported she went to bed around eleven at night and awoke around seven in the morning. (Tr. 600). She stated her hobbies were drawing and watching TV; and she

6

also maintains social relationships with family and friends. (Tr. 600). Plaintiff reported she is physically capable of performing household tasks and maintaining her personal hygiene on a routine basis. (Tr. 600). Her mental status exam revealed she had clear and coherent speech, although it was "tangential" and "over-elaborative"; an optimistic outlook; content mood; no overt signs of anxiety or depression; and no hallucinations or delusions. (Tr. 600-01). Plaintiff's full scale IQ was 89 which placed her in the low-average range of adult intelligence and Dr. Sipps assigned her an overall GAF score of 52.[3] (Tr. 602).

Dr. Sipps opined Plaintiff's ADHD and learning disability would make it difficult for her to understand and remember instructions or maintain an appropriate persistence and pace. (Tr. 603). Dr. Sipps concluded Plaintiff could respond appropriately to supervision, had no difficulty in interacting effectively with co-workers, and was capable of managing typical work stressors. (Tr. 603).

*Morgan Koepke, M.D.*

On examination in September 2011, Dr. Koepke noted 5/5 bilateral strength in Plaintiff's upper extremities and 4/5 strength in her left fingers; and 4/5 strength in her right knee flexors and 5/5 strength in her left knee. (Tr. 607). Although a grasp test showed notable weakness in the left hand, she was capable of normal manipulation, pinch, and fine motor coordination. (Tr. 607). Plaintiff's left knee revealed a only mild edema but her right knee showed significant swelling. (Tr. 608).  Dr. Koepke opined Plaintiff was capable of sedentary work that required standing for no more than two hours a day with the allowance to elevate her left leg. (Tr. 608). She also concluded that Plaintiff could not carry more than ten pounds especially considering need for a cane and could not perform work which required her to reach above her head with both hands. (Tr. 608).

---

3. *Id.*

***State Agency Reviewers***

On September 20, 2011, Vicki Warren, Ph.D., found Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning, and concentration, persistence, or pace. (Tr. 106). She further opined Plaintiff could only comprehend, remember, and carry out simple (1-2 step) instructions and occasionally more complex (3-4 step) instructions. (Tr. 110). Although Plaintiff's sustainability was compromised, Dr. Warren opined Plaintiff could "maintain attention, make simple decisions, and adequately adhere to a schedule." (Tr. 110). Dr. Warren also opined Plaintiff should avoid extensive interaction with others and should have only limited changes in her work environment. (Tr. 110-11).

A month later Elizabeth Das, M.D., concluded Plaintiff could occasionally lift or carry ten pounds, and frequently lift or carry five pounds; stand/walk for two hours in a normal workday; sit for six hours in a normal work day with a periodic alternating between sitting and standing to alleviate pain and swelling; could use a cane as needed; occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; occasionally stoop or crouch, but never kneel or crawl; and had limited left overhead reaching. (Tr. 108-09).

On reconsideration, Dimitri Teague, M.D., and Karla Voyten, Ph.D., agreed with the physical and mental restrictions opined at the initial level. (Tr. 141-42, 144-45).

***VE Testimony and ALJ Decision***

At the hearing, the ALJ hypothesized a younger individual with limited education, who could lift, carry, push, and pull ten pounds occasionally and five pounds frequently; sit for six hours; stand or walk for two hours in a normal workday; occasionally climb ramps and stairs; occasionally stoop or crouch; but could not climb ladders, ropes, or scaffolds; kneel, crawl, or reach overhead bilaterally. (Tr. 89). She would also be limited to simple, routine tasks that did not involve arbitration, negotiation, or confrontation; and she could not work directly with others or be

responsible for the safety of others. (Tr. 89). Further, she was restricted from work requiring strict production quotas, piece rate work, or assembly lines. (Tr. 90). Considering this hypothetical, the VE testified the individual could perform the representative occupations of addresser, document preparer, or film touch-up inspector. (Tr. 90).

Next, the ALJ added a restriction that the individual would have to elevate their legs alternatively in front of them, for fifteen minutes per hour per leg. (Tr. 91). The VE testified no jobs would exist in the economy without an accommodation. (Tr. 91). Returning to the original hypothetical, the ALJ added an additional restriction that the individual would require frequent redirection from a supervisor on a permanent basis to stay on task. (Tr. 91). Again, the VE testified that without accommodations, no jobs would exist. Once more based on the original restrictions, the ALJ altered the sit/stand/walk abilities to sitting for four hours and standing/walking for only one hour in an eight hour workday; again, no jobs existed. (Tr. 92).

On cross-examination, Plaintiff's attorney added manipulative limitations in both handling and fingering to occasional; this would eliminate the three proposed jobs. (Tr. 93-94). The VE also testified if the individual required two additional breaks during the day she would be eliminated from work. (Tr. 94).

In July 2013, the ALJ concluded Plaintiff had the severe impairments of bilateral DJD status post left knee replacement, degenerative disc disease, left shoulder DJD, learning disability, ADHD, and OCD; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 30-32). The ALJ then found Plaintiff had the RFC to perform less than a full range of sedentary work. (Tr. 32). Specifically, she could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs; occasionally stoop and crouch but never kneel or crawl; occasionally reach overhead; must avoid workplace hazards; was limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; no strict production quotas,

assembly line work, or piece rate work; only occasional interaction with others and cannot be responsible for directing the work of others or being responsible for their safety. (Tr. 32).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could perform work as an addresser, document preparer, or film touch-up inspector. (Tr. 39).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred because (1) he improperly applied the treating physician rule to the joint opinion of Dr. Khan and Mr. Goold; (2) he failed to properly analyze Listings 1.02(A-B); (3) the RFC lacked substantial evidence because it did not include a pace limitation; (4) the hypothetical did not accurately reflect Plaintiff because it lacked the need for additional work breaks; and (5) he improperly evaluated Plaintiff's credibility. (Doc. 14, at 3-4). Plaintiff also

11

argues a sentence six remand is warranted because the additional evidence submitted establishes she meets Listing 1.03. (Doc. 14, at 4). The Court will address each argument in turn.

### *Joint Opinion of Mr. Goold and Dr. Khan*

Plaintiff argues the ALJ erred by not applying the treating physician rule deference to the joint opinion of Charles Goold, LISW, and Dr. Sameera Khan, authored in December 2012. She argues the ALJ improperly determined the opinion to be that of only Mr. Goold; and thus, failed to perform the necessary analysis of the opinion under the treating physician rule. (Doc. 14, at 14-19). In his decision, the ALJ stated Mr. Goold completed the assessment and Dr. Khan "signed off on [it]", implying that the opinion was not in fact her own but rather that of Mr. Goold. (Tr. 37). He then proceeded to give the opinion little weight because it was unsupported by the medical evidence and inconsistent with the Plaintiff's activities of daily living. (Tr. 37). Before determining if the weight assigned was appropriate, the Court must first determine if the opinion is that of treating physician.

Plaintiff would have this Court treat the assessment as that of treating physician simply because Dr. Khan's signature is on the form. However, the status of M.D. alone does not confer "treating physician" status on a doctor; rather the doctor must have had an ongoing treatment relationship with the Plaintiff. 20 C.F.R. § 416.902.  An ongoing treatment relationship will exist when "medical evidence establishes that [Plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502. Therefore, for a doctor's signature to transform an opinion into that of "treating physician", the Court must discern if the doctor had an ongoing treatment relationship with the Plaintiff. *See, e.g., Dick v. Comm'r of Soc. Sec.,* 2014 WL 1270594 (N.D. Ohio) (finding doctor who signed off on two assessments was not "treating physician" where there was no evidence she ever treated plaintiff); *Smith v. Comm'r of*

12

*Soc. Sec.*, 2015 WL 350575 (S.D. Ohio); *Soeder v. Comm'r of Soc. Sec.*, 2014 WL 3687772 (N.D. Ohio).

The record shows that Dr. Khan saw Plaintiff on three occasions over a period of ten months for medication management before the assessment was completed. (*See* Tr. 688, 763, 770). Importantly, at the time the assessment was completed in December 2012, Dr. Khan had not seen Plaintiff in three months. (Tr. 693-95, 770). This brief and intermittent relationship is not sufficient to create a "longitudinal picture of [Plaintiff's] medical impairments" which would warrant deference. *Rogers*, 486 F.3d at 242. *See e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[T]he assumption that the opinion of a treating physician warrant greater credit than the opinions of [others] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."); *Helm v Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011); *Yamin v. Comm'r of Soc. Sec.,* 67 F. App'x 883, 885 (6th Cir. 2003). The treating physician rule is intended to grant deference to those medical sources that have a detailed and complete picture of the Plaintiff's medical history; that rationale does not apply to Dr. Khan.

Although Dr. Khan's relationship with Plaintiff did not rise to the level of treating physician, the ALJ is still required to determine the weight of her and Mr. Goold's opinion. §§ 416.902, 416.927. Since Dr. Khan did concur in the opinion of Mr. Goold, the opinion must be analyzed as that of a non-treating source. The standard for analyzing the opinion of a non-treating source is more stringent than that applied to an "other source" opinion (which would otherwise apply to Mr. Goold's opinion); as such, the Court will apply this standard in reviewing the ALJ's decision.

The factors for determining the weight of a non-treating source opinion are the length of treatment relationship, the frequency of examination, the nature and extent of the treatment

13

relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).  As well as any fact "which tend[s] to support or contradict the opinion". § 404.1527(c).

The ALJ gave this joint opinion little weight because it was not supported by the medical evidence and was inconsistent with the Plaintiff's activities of daily living. (Tr. 37). In reviewing the medical evidence it appears that the December 2012 assessment was overly restrictive and, in some places, completely devoid of a basis in fact. The ALJ noted inconsistent activities of daily living which indicate her ability to get along with others and complete tasks were not as restricted as was opined; for example, her care of a teenage child, cooking, and doing repairs around the home. (Tr. 37, 600, 766, 768). Further, it was noted Plaintiff had three or more episodes of decompensation within the last twelve months (Tr. 694); however, nowhere in the medical record, or Dr. Khan's or Mr. Goold's records is there any indication of such episodes. There were no significant alterations in her medication, no increased frequency of appointments, and no evidence of the need for hospitalization for her symptoms. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00. The ALJ's reasons are sufficient to diminish the weight given to the joint opinion of Dr. Khan and Mr. Goold, and thus, he did not commit error in assigning it little weight.

### Listing 1.02(A) and (B)

Plaintiff's second argument centers on the ALJ's failure to adequately explain why she did not meet Listing 1.02 in violation of the principle that the ALJ must provide explanation sufficient to provide meaningful review. (Doc. 14, at 21-22); *see Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011).

In considering the listing of impairments there is no "heightened articulation standard"; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v.*

14

*Astrue*, 2012 WL 568986, at *6 (S.D. Ohio) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The court may look to the ALJ's decision in its entirety to justify the ALJ's Step Three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Despite this, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6 (citing *Reynolds*, 424 F. App'x at 415-16); *see e.g., Parks v. Comm'r of Soc. Sec.,* 2014 WL 5323072, at *4 (S.D. Ohio) (holding the ALJ erred where he "neither set forth nor properly evaluated the elements of [the listing], despite the existence of evidence that arguably met the Listing."). However, it is ultimately the claimant who bears the burden of showing she meets or equals a listing impairment. *Thacker v. Soc. Sec. Admin.,* 93 F. App'x 725, 727-28 (6th Cir. 2004). In accordance with that principle, remand is only appropriate when the record raises a "substantial question" over whether Plaintiff actually meets the listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641-42 (6th Cir. 2013) (citing *Abbott v. Sullivan*, 905 F. 2d 918, 925 (6th Cir. 1990)).

In his opinion, the ALJ states that Plaintiff does not meet the requirements of Listing 1.02 but does not elaborate further within Step Three. (Tr. 31). Thus, the Court must look elsewhere in the opinion to determine if the ALJ sufficiently discussed the medical evidence as relates to the requirements in Listing 1.02. To meet Listing 1.02, a Plaintiff must show the following:

> **1.02** ***Major dysfunction of a joint(s) (due to any cause)***: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.02.

It is clear from the ALJ's opinion that he recognized Plaintiff had moderate to severe DJD in both knees as shown by both x-rays and MRIs. (Tr. 35, 578). He also noted her consistent complaints of pain in both knees. (*See* Tr. 35, 608, 634, 718-30). Thus to meet Listing 1.02(A), there must be evidence supporting an "inability to ambulate effectively" which is defined as "an extreme limitation…that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." § 1.00B2b. Relevant to this requirement, the ALJ noted Plaintiff's extensive reported activities of daily living and her continual reports that she was able to complete them, improvement after surgery, and observations of full range of motion and normal strength in both knees. (*See* Tr. 34-35, 607, 637, 639-43, 775). Viewed in its entirety, this Court finds the ALJ had substantial evidence to support his finding that Plaintiff did not meet Listing 1.02(A) at the close of hearing evidence[4]; and Plaintiff has not directed this Court to any other evidence to refute this conclusion.

Moving now to Plaintiff's shoulder complaints, the Court finds the ALJ adequately discussed the objective evidence involving her shoulder. (*See* Tr. 33-35). Significantly, there is no evidence of any medical imaging of her shoulder after the alleged onset date, which alone would render her unable to meet the listing requirements. However, there is further evidence that her shoulder was improved, if not completely healed; she had full strength; no swelling or atrophy;

---

4. Medical evidence submitted after the close of the hearing and not specifically incorporated by the Appeals Council is not part of the record for review. *See Cotton v. Sullivan*, F.3d 692, 695–96 (6th Cir. 1993); ***Error! Main Document Only.****Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (6th Cir. 1991). The proper avenue for review of this evidence is under a sentence six remand; as such, the Court will address the evidence submitted after the close of the ALJ's hearing record in conjunction with Plaintiff's request for such relief.

16

and was capable of fine motor coordination with her left hand. (*See* Tr. 356-60, 560-61, 607, 637, 738-52). Taking into account the evidence discussed by the ALJ and the Plaintiff's complete lack of citation to any objective evidence to the contrary, the Court finds there is not a "substantial question" as to whether Plaintiff meets Listing 1.02(B). *Sheeks,* 544 F. App'x at 641-42.

Therefore, the ALJ did not err by failing to analyze listing compliance at Step Three because he adequately discussed the medical evidence that undermined conclusions of listing level impairments in a subsequent section of his decision. *See Bledsoe*, 165 F. App'x at 411 (finding an ALJ need not repeat an analysis merely for the sake of formality, if it was performed elsewhere in the decision).

### *RFC*

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

Plaintiff argues that all of the relevant opinions: Dr. Khan's and Mr. Goold's, Dr. Sipps, and both State Agency Reviewers, concluded that she had limitations in her ability to maintain concentration, persistence, and pace; and thus, the ALJ's failure to include a pace-based limitation was in error. (Doc. 19-20).  Plaintiff relies on the holding in *Ealy v. Comm'r of Soc. Sec.,* to support her position that the ALJ's failure to include a pace-based limitation was reversible error. 594 F.3d 504, 516-17 (6th Cir. 2010).

17

In *Ealy*, the ALJ chose to credit the opinion of one psychologist over another; specifically within that opinion was a conclusion that the individual could "sustain attention to complete simple repetitive tasks for two-hour segments over an eight-hour day where speed was not critical." 594 F.3d at 516. Yet, when the ALJ posed hypotheticals to the VE he omitted both the speed and pace-based restrictions. *Id.* The Court held the ALJ erred because he had omitted restrictions which were explicitly included in an opinion he had chosen to rely on. *Id.* at 517. That is not the case here.

An ALJ need only include restrictions which he finds credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Accordingly, the opinions of Mr. Goold and Dr. Khan and the State Agency Reviewers, which were accorded less weight, are not at issue. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Rather, it is Dr. Sipps' opinion that was given great weight, which must be reflected in the RFC. *Ealy*, 594 F.3d at 517. Dr. Sipps found Plaintiff was "considerably impaired" in her ability to perform "simple and multi-step tasks" and was "limited in her ability to maintain appropriate persistence and pace". (Tr. 603).

The ALJ's RFC included a restriction to simple, routine tasks, and precluded work that required strict production quotas. A restriction on work with production quotas implies a pace-based limitation, because quotas inherently involve a formula connecting output and time. The ALJ's failure to include the exact word does not render his limitation regarding pace, i.e., preclusion of production quotas, in error. Further, this restriction adequately addresses the underlying source of Plaintiff's limitations, her ADHD. (*See* Tr. 603); *see Jones v. Comm'r of Soc. Sec.,* 2014 WL 861199, at *4 (N.D. Ohio). Here, the ALJ's RFC accurately reflected the limitations of Dr. Sipps' opinion and complied with the ruling in *Ealy*.

18

*VE Hypotheticals*

Plaintiff next argues the ALJ erred because he did not include a hypothetical to the VE regarding her need for additional breaks during the workday. (Doc. 14, at 21). However, "[i]t is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey,* 987 F.2d at 1235. The restriction requesting additional work breaks was included in the opinions the ALJ found to be entitled to less weight. Instead, the ALJ included hypothetical restrictions based on findings of Dr. Sipps, which did not include any provision for additional breaks. As stated above, the Court has already found the joint opinion of Dr. Khan and Mr. Goold was not entitled to greater weight, and thus, the ALJ did not err by not basing his hypotheticals on that opinion. The ALJ's hypotheticals accurately reflected Plaintiff's abilities; as such, the ALJ's reliance on the VE's testimony is substantial evidence. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)).

*Credibility*

In her final assignment of error, Plaintiff argues the ALJ did not properly evaluate her credibility; however, she simply states the ALJ mischaracterized the evidence without any reference to it. (Doc. 14, at 22). Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The

Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

In this case, the ALJ noted Plaintiff's own reports of daily living, such as driving, cooking, and caring for her personal hygiene as evidence that she was capable of more than she testified to. (Tr. 31, 73-74, 277-78). Yet, her activities of daily living were only one of the things the ALJ considered; he also discussed reports of her "embellishing" her symptoms and inconsistent medical evidence. (*See* Tr. 32-38, 356-60, 560-61, 607, 637, 775). Although it is certainly possible for Plaintiff to interpret the evidence differently, it does not make the ALJ's citations any less appropriate. The question on review is not whether substantial evidence could support another conclusion, but rather, whether substantial evidence supports the conclusion reached by the ALJ. *Jones,* 336 F.3d at 477.  In light of the evidence discussed in the ALJ's decision, this Court finds the credibility determination was supported by substantial evidence.

***Sentence Six***

To be granted a sentence six remand a plaintiff must establish two prerequisites before a district court may order the taking of additional evidence.  *Hollon v. Comm'r of Soc. Sec*., 447 F.3d 477, 484 (6th Cir. 2001). In particular, a claimant must show: (1) the evidence at issue is both "new" and "material"; and (2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996). The party seeking a remand bears the burden of showing that these two requirements are met. *Oliver v. Sec'y of Health and Human Servs*., 804 F.2d 964, 966 (6th Cir. 1986).

The Sixth Circuit explains "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Hollon*, 447 F.3d at 483-84. Such evidence, in turn, is deemed "material" if "there is a probability that the [Commissioner] would

20

have reached a different disposition of the disability claim if presented with new evidence." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

The evidence Plaintiff submitted to both the Appeals Council and to this Court in support of a sentence six remand is summarized below. (Doc. 14-1, 14-2 and Tr. 783-99).

In February 2012, Dr. Chonko performed a right total knee arthroscopy on Plaintiff. (Tr. 786-89). A few months later, Plaintiff fell and reported to the emergency room with shoulder and hip pain which were tender on manipulation. (Tr. 793). In June 2013, Dr. Chonko diagnosed osteoarthritis in both knees. (Tr. 784). Plaintiff had a left total knee revision on July 30, 2013. (Tr. 796-99). Although initially improved, Plaintiff had to undergo another left knee arthroscopy in June 2014, which revealed partial dislocation of the patella. (Doc. 14-1). After complaints of persistent left knee pain, Plaintiff underwent a fourth left knee arthroscopy in February 2015, which revealed intact ligaments, no significant osteolysis, and well-fixed bones; but also the presence of scar tissue, which was removed. (Doc. 14-2).

Preliminarily, much of this evidence cannot be found to be new, as it was in existence prior to the ALJ hearing; specifically the right knee arthroscopy in 2012, the emergency room reports of 2012, and the treatment notes of Dr. Chonko in June 2013. Furthermore, Plaintiff has not argued that good cause should excuse her failure to submit these documents to the ALJ; and thus, they cannot be considered for the purposes of evaluating a sentence six remand.

Next, evidence related to her subsequent left knee arthroscopies is new because the procedures were completed after the ALJ had already finished his opinion and therefore, could not have been submitted at the administrative proceeding. *Hollon*, 447 F.3d at 483-84. The Court must now consider the materiality of these subsequent procedures to Plaintiff's condition at the time her disability determination was adjudicated by the ALJ. *See Wyatt v. Sec'y of HHS*, 974 F.2d 680, 685 (6th Cir. 1992). It is apparent that the surgeries completed in 2014 and 2015 bear little

relevance to Plaintiff's condition as evaluated by the ALJ in mid-2013. Rather, these surgeries are evidence of a deteriorating condition and are not representative of Plaintiff's physical state at the time of the hearing. *See Sizemore v. Sec' of Health and Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988) (citing *Oliver*, 804 F.2d at 966). But the left knee arthroscopy from July 30, 2013, completed the day after the ALJ rendered his opinion, would speak to Plaintiff's abilities at the time the ALJ was considering her claim. However, the ALJ had the opportunity to review all the evidence leading up to this surgery and found it unpersuasive of disability. Further, the evidence presented by the Plaintiff regarding this surgery and its subsequent success or failure is completely lacking; the Court can only review the operative report which stated the surgery was successful. (Tr. 797). In light of this, the Court cannot find the ALJ's decision would have differed with the addition of this minimal new evidence.

A sentence six remand is not warranted by the evidence presented by the Plaintiff. As such, the appropriate remedy is "to initiate a new claim for benefits as of the date the condition aggravated to the point of constituting a disabling disability." *Oliver*, 804 F.2d at 966.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore affirms the decision of the Commissioner.


  s/James R. Knepp II
United States Magistrate Judge